May it please the Court, Joseph Daly for the Plaintiff's Appellants. With me at council table is Eric Isaacson. Your Honors, I'd like to reserve five minutes of my 20 minutes time for rebuttal. Your Honors, what I'm going to talk about this morning is the District Court's reversible error in not upholding our allegations in this securities fraud action. Now the crux of this action are the defendants knowingly false and misleading statements regarding their C-130J cargo planes, these 50 million dollar planes, as well as the false financials that they issued for third quarter 1998 which included a secret hundred and twenty million dollar accounting adjustment. Was this the accounting, as you say, misstatement or error or whatever that was disclosed in the 10-K they filed with the SEC? It was, well, two answers to that, Judge Thompson. The disclosure itself, it was buried within the within the within the 10-Q. More importantly, the so-called disclosure occurred two weeks after the statement was made to the market. They primed the market for the third quarter results on September 20th when they told the market we are going to be, things are going great this quarter. We expect to have third quarter 1998 earnings per share of $1.67. A month later, on October 20, they come out and make the official announcement, guess what investors, we have met our earnings per share for this quarter. We have come in at exactly $1.67 per share and by the way, things are going to be even better in the fourth quarter because all of our filing of that 10-Q does not occur until two weeks later on November 2nd and it is in that particular filing that it's just a two-line item buried in all these pages of financial discussions and as the Wall Street Journal pointed out on November 11th, that wasn't much of a disclosure at all. In fact, when the Wall Street Journal came out and described exactly what they had done with the share, just by reducing a reserve in one area and putting the money over into the other area as quote, net income, on that disclosure by the Wall Street Journal, the market punished Lockheed's stock very dramatically, sending the stock down $8. Returning to the C-130 cargo planes, throughout the entire four-month class period, the defendants fed a constant mantra of, we are going to make these deliveries. They started off the class period by saying, we're going to make these deliveries in third quarter and fourth quarter 1998. That is, we're going to deliver 30 of these $50 million planes on July, August, September and then October, November, December and that was just not true. It was impossible. There were only four main customers, there were only four customers, pardon me, for these type of planes. The Italian government, the Australians, the British government and the Americans. I know I've covered this in my brief, but I just want to hit upon it briefly. The Italians weren't going to take any. They weren't going to take any in 1998. That wasn't going to occur until 1999. The Australians themselves had come to Lockheed four months prior to the class period and said, there are some unacceptable safety risks with these planes that you're showing to us. We don't want to take these planes until you fix these problems. And a Mr. Walker of the Australian Aerospace Acquisition Division says, and we quote him in our complaint, that Lockheed came back to him and said, came back to the Australians and said, well if that's what you need, we can't do that for you until mid-1999. The district court determined, did it not, that these statements were subject to the forward-looking safe harbor? Yes. The district court threw the forward-looking blanket over all the statements. And I agree, some of the statements that the defendants were making throughout the class period were forward-looking, although they were not identified as forward-looking at the time and there was no cautionary language. Was the law required that they be labeled as such? It certainly does. It's within the statute. The safe harbor protection, if you were going to use that for protection, the safe harbor statute says that the statements must be identified as forward-looking and accompanied by meaning. It's not enough to say we expect to, our projections are, etc. We have to say in the writing what follows the colon in the middle of the sentence is a, quote, forward-looking statement under the Reform Act. Well, Judge Hawkins, I'm just giving you the plain language of the statute. When I get up for my rebuttal, I'll bring the statute with me. But beyond that, I think what we've pleaded here is a strong case of actual knowledge. These are much more than Your argument is, even if they're all covered by safe harbor, you've done enough to show knowing. They were knowingly false or misleading. And that's a subtle distinction, I think, that both the district court and the defendants have missed. I think both the district court and the defendants are trying to tell this court, on the day when Mr. Coffman tells the market we are going to deliver 30 planes in third quarter, in fourth quarter 1998, Mr. Coffman must know at that exact moment that there is no way he's able to do that. How many planes did they deliver? We say they delivered none. Paragraph 56 of the complaint, I believe, we allege that they delivered zero C-130s during 1998. They have pointed to one simple bullet point line item in an annual report that is from outside the complaint that states we delivered 19 C-130s during 1998. We say they delivered none. Now, our allegation must be accepted as true. They're coming in here with a simple bullet point statement, no other evidence at all. They've produced no other evidence of the 19 deliveries during 1998, nor should they be able to on a motion to dismiss, but be that as it may, for all the paperwork that's flying around in this case, I mean, through the Freedom of Information Act, we've been able to plead and describe with specificity in the complaint, memoranda from Australian and United States Air Force personnel. We've got witness statements from six Lockheed employees, longtime employees. The man that was in charge of the entire C-130 production line over in Marietta, Georgia, we've got all that saying that these deliveries were not happening. And on the other side of the equation, the defendants have come in and pointed to one, well, I'll say it, one bald bullet point in an annual report that is completely from without the complaint, and we dispute its authenticity. And under this Court's decision in Lee, this Court cannot accept the defendant's self-serving factual representation. You know, that bothered me, too. How did that annual report information even get in here to this consideration as to whether the complaint was sufficient? Well, the district court did say that she was not going to grant the defendant's motion for judicial notice. She felt she didn't have to go there. I know below, perhaps on an earlier iteration of the briefing, the defendants had pointed to that annual report, not for the 19 deliveries, but for another bullet point item in there that said FAA certification during 1998. We had alleged that as late as August 1998, FAA certifications were more than a year behind based upon what we were told by a Lockheed test flight engineer who was responsible for those certifications. And that is how it first got mentioned. It was never mentioned below for the purpose that it's trying to be used for now. One thing the district court did that, again, rises to the level of reversible error is it refused to accept the pleaded allegations that we had. It wasn't just muted sounds of discord coming in to upper management at Lockheed that the C-130 project was doomed. It was a cacophony of sound. And it was coming from all over. It was coming from their customers. It was coming from some of their top employees charged with responsibilities for these planes. It was coming from defendants themselves. They were telling the military back in April 1998, you know what, fellows? We're not going to be able to make those C-130 deliveries quite as early as we thought. They have now slipped out all the way to December 1998, the very end of the fiscal year. And United States Air Force General Tommy Walters wrote in a contemporaneous memorandum at the time that even that December delivery was considered medium to high risk. And of course, fast forward to December 1998 and what happens. The defendants go to the Air Force and try to convince the Air Force to take the planes that aren't even ready yet. They say to the Air Force, please enter into these ship in place agreements with us. Let us keep the planes here on our tarmac and keep on working on them. But you take them and that way we'll be able to tell our shareholders that we actually have delivered the airplanes in 1998. Now, that's me paraphrasing a general's memo. And that's General Lichte, L-I-C-H-T-E, who's corroborated by Lieutenant Colonel Allen, who says the same thing. That Lockheed came to the Air Force in late 1998, and I believe the strong inference is that it was in December 1998, and said those planes, those first deliveries that we were going to give to you have slipped out even further, but would you please allow us to take them, would you please allow us to say that we have delivered them in 1998? And we can tell from the complaint what the defendants' idea of delivery was, because they made one so- called delivery to the British on August, I believe it was August 24th, 23rd or 24th, big beautiful press release with the brass bands. We've delivered a C-130 to the British, and in that and later public statements, this shows our ability to be said. Well, we know that's not true. We have a contemporaneous memorandum written by a United States Air Force colonel, I believe, pointing out, yes, Colonel Fletcher, pointing out that it wasn't a delivery at all. The plane was going to be returned to Lockheed for further work. It wasn't ready yet. The first actual acceptance by the British, he writes in his memorandum, was going to be in mid-1999. The first actual acceptance was on hold because of quote, known deficiencies with the plane. So I think there's little doubt based on the pleaded facts in the complaint that those C-130 deliveries were not going to happen in 1998. They didn't happen in 1998. We stand by our allegation that there were zero deliveries in 1998. I think there are several facts in here that we can look at that show the defendant's actual knowledge of what they were doing when they told certain things to the market that just weren't happening. For example, on the day that they divulged that they would not be making a certain number of deliveries in 1998, they turned around in their press release and they blamed the shortfall of the deliveries on who? The Australians. They said of the 30 planes we were going to deliver this year, up to one-third of them had been cut by the Australians in the United States Air Force. Now how can they point back to the Australians when they were told back in April 1998 by the Australians, we don't want these planes with their unacceptable safety risks until 1999? It just boggles the mind. How can they blame the cuts on the United States Air Force when it was they who had gone to the United States Air Force begging them to take the planes early? Well, I see the yellow light here is some... Well, you're not quite down to five. If the five is what you want to save, you've got a minute and a half. I'm going to go until five. I want to talk a little bit about some other factors that bolster the defendant's actual knowledge in this case. I think all those facts I just mentioned to you, not only do they show falsity, but they show scienter under this court's precedent. But there are a couple of things here that also bolster the inference of scienter. One of them is temporal proximity. Now I know the defendants hated that idea of temporal proximity because in another case, NELCOR, this court said temporal proximity alone won't suffice. Well, but we don't have temporal proximity alone. We have that cacophony of memoranda and highly placed Lockheed employees, but we also have it bolstered by the fact that right up until the bitter end, the defendants were telling investors and telling the market, we are going to deliver these 50 million dollar planes. There weren't that many of them. There were 30 of them. It's not too difficult to keep track of 30, 50 million dollar planes in an assembly line. And the Wall Street Journal, I mean the Bible of the American financial industry, was so upset with Lockheed, it took Lockheed to the woodshed. It said until yesterday, on December 24th, it said until yesterday, this company had been telling us a different story. I think that is a very strong indication of the temporal proximity there is a very strong indication of defendants' knowledge. The importance of the items to ReadWrite, pardon me, to Lockheed, again we're not talking about windshield wipers on Ford Explorers on an assembly line up in Dearborn, Michigan. We're talking about a 50 million dollar behemoth cargo plane. When something goes wrong with a 50 million dollar cargo plane that you are counting upon to make your annual numbers and worried about and fretted over at the very top levels of the company. You're now at five minutes. And I will sit down. Thank you. Counsel, thank you for your argument. We'll hear from Lockheed. Mr. Aronson. Thank you. Good morning, Your Honors. May it please the Court, Seth Aronson of O'Melveny & Myers on behalf of the defendants. Your Honor, there are two primary issues on this appeal. Number one, whether the statements concerning the C-130J and the sale of the F-16 fighter jets were forward-looking statements. And if so, whether plaintiffs pleaded with sufficient particularity that each defendant actually knew that his statements were false or misleading when made. Actual knowledge. Not reasonable basis, but actual knowledge. The legal framework that Judge Felser used in dismissing plaintiffs' fourth attempt to plead a viable claim, their third amended complaint, original complaint, first, second, third amended complaint, four amendments. The Reform Act says you must plead with particularity that each statement that you're alleging was false and why it was false. So plaintiffs' theory about this as a whole mosaic is thrown out. The mosaic theory of pleading is gone. They have to identify each statement that was supposedly false and explain why it was false. The Reform Act, with respect to forward-looking statements, requires, I think the phrase is, meaningful, cautionary statements. Your Honor. Can you show me where there were meaningful, cautionary statements about these what you claim are projections? The meaningful, cautionary statements were made in Lockheed Martin's SEC filings. What plaintiffs did here was very carefully not allege any falsity in the SEC filings. They went out to look at either press releases or statements made at investor conferences and elsewhere where those statements are made, but it's hard to get it into the record because you need to have a transcript and witnesses. But counsel from the state of the safe harbor, there are two prongs to the safe harbor. There is one prong that requires that if you put in meaningful, cautionary language, you have a safe harbor. Period. End of story. However, if you do not have the cautionary language, then plaintiff must show actual knowledge. There are two prongs. There is no requirement that a forward-looking statement be accompanied by meaningful, cautionary language. It only needs to be statements here was. How is that identified? Excuse me? How does it have to be identified? By the language itself. When Lockheed Martin says we expect to sign an F-16 contract by year end, everyone knows from that statement it's forward-looking. We haven't signed the contract yet. We expect to do so at some point in time in the future. All of the C-130J forecasts, delivery statements, were also forward-looking statements. Their own language. We expected to deliver 30 aircraft in the third and fourth quarters of 1998. We expected robust deliveries. The 25 deliveries were scheduled. We were on track. Deliveries were on target. These were all forward events. Prediction of a future event that we will deliver these aircraft by year end. The statements and the safe harbor protects the assumptions underlying those projections as well. You know, I'm looking at the language from the statute in subsection large A, and it looks to me like the requirement is conjunctive, not disjunctive. Identified as a forward-looking statement and accompanied by a meaningful, cautionary statement. That's the first prong. The second prong is even when not accompanied by cautionary or meaningful language, then it's actual knowledge. That's what all the cases have decided. Plaintiffs argued that below. They argued in the first round, and Judge Felser, I quoted the statute and showed there are two prongs to it. It's either or. It is disjunctive. The reason is Congress intended or encouraged companies to give projections. That's an important part of the Reform Act. Congress said, we want companies to give us your projections, your forecast. Tell us how you see the future happening. But if you do, we will not hold you liable if you either give us the cautionary language or unless there's actual knowledge. So this is Congress's intent as laid out in the Reform Act. This is not a case of reporting bad existing facts. And I'll get to the Atlas Reserve in a second. But it's not an issue here of improper revenue recognition. There's no false reporting of sales or deliveries. There's no violation of any financial statements. It's a case of rejected delivery schedule. And the delivery schedule ultimately slipped. And it only slipped by a few weeks. Only slipped by a few weeks. Plaintiffs talk about the one plane to the British and that it was brought back and returned for testing. True. And fully disclosed at the time of the announcement. At the time of the announcement of the sale to the British, Lockheed Martin said, this plane is coming back for further testing. We're delivering it to the British, but we have further testing to do. That's not a I suppose if one bought an automobile and it got recalled because of a defect, you would still think that the purchaser had taken delivery of the automobile. Is that the analogy? That could be an analogy. Let me give you a closer analogy. When you purchase a car from a car dealer and you pay for it, you buy it, and you want the car dealer to install some additional things on it. Maybe you want some different GPS in there. You pay for the car, but it stays on the dealer's lot for a week or two or longer until the dealer makes those changes. But the risk of title and transfer has occurred. Let me address the 19 deliveries that the counsel says were never made. And true, we did have the court take judicial notice of our Form 10-K, which burden to show that no planes were delivered. It's the plaintiff's burden. The plaintiffs were required to come in with specificity under the Reform Act and say that Lockheed Martin has declared that no aircraft were delivered. They have no source for that. For all of their Freedom of Information Act quotes and sources and documents that they say have been flying around here, there's absolutely no source that says zero planes were delivered in 1998. But there is one piece of paper that they submitted that does show that there were 19 aircraft delivered. The plaintiffs claim that the truth on the market emerged on December 23, 1998, when Lockheed Martin announced its disappointing results and announced that it would not be able to make the delivery of the – that the delivery schedule for the C-130J had slipped. That's what they claim was the truth on the market. And they cite to a Wall Street Journal article on December 24 that announced the results. And it says that Lockheed Martin announced that its C-130J delivery schedule was off by one-third, a nearly one-third cut. And this is from the complaint in Paragraph 99, the Third Amendment complaint, that Lockheed attributed much of its 1998 difficulties to a nearly one-third cut from the 30 C-130J cargo aircraft it had expected to deliver to the Air Force and the Australian government. Okay. One-third of zero is not a number. One-third of 30 is 10. Okay. We're within the 25 to 30 range of forecast. We delivered 19. That's their source. That's what they say is the truth that was delivered to the market at the end of the class parade. How did they reconcile that? Lockheed Martin doesn't have to come forward with evidence to defend itself. It's the plaintiffs who are required to come forward under the Reform Act with specificity, explain why the statement was false, and show us why it was false, explain why it was false. And they never did so. All they say is, it's in our complaint. Take it for granted. It's a disputed fact. They don't get that benefit here, Your Honor. Ninth Circuit precedent is clear, and this is the Gomper case, and it's been followed by Clorox, that the usual lenient pleading standards under the federal rules do not apply to securities cases. The Reform Act changed that. So when we have, perhaps, a Connolly versus Gibson resolve all doubts in favor of the pleader in most cases, the Reform Act says, no, you don't do that. You take only reasonable inferences from the complaint, and you also take competing inferences that do not lay out fraud. And if they don't measure out, if one doesn't weigh out the other, plaintiffs have not satisfied their burden of showing fraud. The burden is on them, not on us. So if you have competing inferences, one that says fraud, the other says no fraud, plaintiffs lose. And they have nothing to show that those 19 claims were not delivered. Let's talk a little bit about the F-16s. The F-16 was one statement that was made in August of 1998 in which we expected to sign a contract with the United Arab Emirates for F-16 fighter planes. It was never announced that this was going to have anything to do with earnings. This was a pure cash flow issue. The way defense contracts work, they would have taken the cash in, but they would not be able to recognize the revenue as earnings until they actually implemented the contract and went forward with it. Was it the allegation that these F-16s had technology that would not even be in the U.S. arsenal for five years? Well, plaintiffs said that. Lockheed Martin never announced it. They have no source for the complaint. We are here on a complaint. Right. They said that that our ally Israel would not have the technology for five years. That's what they said. No support for that. No explanation. They say it in their complaint, but they also say in their complaint that the that the contract with the United Arab Emirates was signed in 2000. Is it conceivable that the United States would sell the UAE fighter aircraft with technology five years advanced from what we had provided to our ally Israel? Well, whatever. If that was the case and if that was then that was known to the public at the time this statement was made, that any analyst looking at this could say, well, wait a second, if that's a sophisticated aircraft and the U.S. government won't allow our ally Israel to have it, well, then the market knows that. Lockheed Martin made no statement that this is advanced technology that that that other countries don't have. They what they point to is that the Pentagon had disapproved of a Boeing sale of F-15s to Saudi Arabia and Egypt. And as Judge Felser pointed out, that's a different plane to it, to different buyers made by a different defense contractor. That doesn't add up to fraud here. And if that's the case, then the world knew it and the world could discount that in a market could discount the fact that they made that statement about the the F-16s. They say it was more than five years out. It was signed within two years. But there's no causation for that argument either on the F-16s, Your Honor, because the the only effect that the F-16 contract would have was on Lockheed Martin's cash flows, not on earnings. And Lockheed Martin, at the end of December 1998, made its cash flow in numbers. So there's nothing there is no harm to the investors based on the fact that the contract was not signed within the year. But again, forward looking statement. And they have to have contemporaneous knowledge of the time the statement was made about the F-16 signing that Vance Kaufman and Marcus Bennett actually knew that it was not going to happen. And they don't have that simply because the Boeing was rejected for another plane to another buyer is not actual knowledge. Your argument, I take it, is that should have known, must have known, doesn't cut it. It clearly doesn't cut it under the statute, Your Honor. And is actual knowledge. And the words in the statute are actual knowledge. And that's what they need. And they need they need sources for that. The Reform Act says they need sources. They need contemporaneous facts. They need something that says on that day you actually knew that wasn't going to happen. And Congress wanted to protect these forward looking statements. And we're entitled to that protection. Does it seem to you that with this legislation that we've gotten back to the forms of action that we used to be dealing with way back when and that we got away from with notice pleading and now we're back to the forms of action again, aren't we? Well, Your Honor, the Reform Act is very specific as to what Congress wanted. And and and the great weight of authority in this circuit and in other circuits provides what the quantum is. They have to have particularity as to this mental state. They have to have contemporaneous information. They have to have facts, not just allegations. That's what makes this these cases different from all other federal cases. Do they have to have the facts? They have to state the facts in a very particular way. Correct, Your Honor. And that is and that is exactly what Congress has requested. They must state with particularity facts giving rise to a strong inference that the defendant acted with a required state of mind. Here, actual knowledge. They must plead with particularity that statements alleged to have been false and the reasons why. That's what the statute requires. It is not notice pleading. And as this court has said, the Reform Act's heightened pleading requirements are, quote, an unusual deviation from the usually lenient requirements of federal rules pleading. And that's the Clorox case. So it is much different. You know why? Why that act was enacted? There is there's sufficient legislative history, Your Honor. And Congress was getting tired of companies being sued every time their stocks happened to fluctuate. And interesting, President Clinton first vetoed the Reform Act, but then it was overturned. That veto was overruled. Even Senators Kennedy and Feinstein said enough is enough with these types of cases. Let me address now the temporal proximity argument. The plaintiffs themselves say that we had a tentative agreement with the United States Air Force in December of 1998 to accept seven of the C-130Js and a ship in place arrangement. Tentative agreement with the government. That, when you're looking at someone's intent, that's pretty close to saying, yeah, I think we were pretty close to a deal. That's not supportive of actual knowledge of fraud. That is the temporal proximity is that the government had said, we'll tentatively accept those. They didn't accept them. They accepted them the following month. This isn't a question of the delivery schedule slipping by a year. Those seven aircraft were delivered in January of 1999, the beginning of January 1999, and a few in February 1999. Talking about a delivery schedule that slipped by a few weeks, that's not securities fraud. We wanted to have them shipped in the fourth quarter, you betcha, but the delivery schedule slipped, the holidays came up, and a week before the end of the year, Lockheed Martin said, we're not going to get those deliveries made this month. We're going to have them delivered next month. That's not securities fraud. Oh, they sued us for those seven deliveries in another companion case before Judge Velzer. That case was dismissed by the plaintiffs, and they're not appealing that. Let's talk about the Atlas Reserve in my closing moments. Judge Velzer, again, was able to dismantle this. Here are the statements that were made. Lockheed Martin gives an earnings release, which companies do. They issue a press release and say, here's what our earnings are going to be for the quarter. That press release of their third quarter results said, quote, that some of those results reflected, quote, a significant improvement related to the Atlas launch vehicle program. That's what the earnings release said on October 20th, 1998. Twelve days later, the 10-Q comes out, as is required, and the 10-Q laid out that this change in estimated pre-tax earnings by $120 million is attributable to the success in the Atlas program. They had a reserve that was set aside. The program had been going on for many years. It was bought from a San Diego defense contractor. The program ran well. You reversed the reserve. There's no allegation that that reserve was improper when it was taken, that the reversal of the reserve did not comply with generally accepted accounting principles. That's not the allegation. They're saying, we hid it, we buried it. Well, we mentioned in the press release that the Atlas program was doing well. We mentioned in the 10-Q, right down to the dollar, how much of the reserve was being affected by the reversal of the Atlas Reserve, and the stock price gave a big yawn. Here's how the stock price worked. When the press release came out on October 28th, this was on the record, the stock price was trading at $108.08. That's before we had these decimals in our stock system now, $108.08. The closing stock price on November 3rd, 1998, the day after the disclosure was in the 10-Q, it was up $109.16, almost a dollar gain. That's what they're talking about. The price went up on the disclosure. It was not until the Wall Street Journal published a negative story on Lockheed Martin in which it republished it. There's no new news there. The Wall Street Journal had a negative article on Lockheed Martin. Yes, the stock price dropped that day, but the stock price was dropped, was momentary. The stock recovered to close by $107 by the close of the next day. Judge Felser looked at that and said, that's not fraud. That was disclosed in the 10-Q where it was supposed to have been disclosed. The earnings release had sufficient disclosures, and the stock price didn't move as a result of any of this. Again, there's no allegation that there's any accounting impropriety or any misreporting of the financial statements there. They just don't like the way the reserve was made. They say that it masked problems in the company. It was fully disclosed, and that's what this case is about. It's a disclosure, and it was made. Finally, Your Honors, this Court has an opportunity to provide guidance to the district courts on the group pleading presumption under the reform, that we argue did not survive the Reform Act, and the Fifth Circuit has recently held that. Most of the district courts in this circuit do not apply the group pleading presumption. It is a relic before the Reform Act, because the Reform Act, as the Fifth Circuit said, requires that the requirement that you state that each false or misleading statement was stated with particularity, giving rise to a strong inference that the defendant acted with the required state of mind. The Fifth Circuit and most of the district courts in this circuit that have looked at that said that statutory language says that you don't get this group pleading presumption at all. It's gone. For each of the defendants, it has to have been a speaker, and you have to state with particularity why each of those speakers had the requisite state of mind to your actual knowledge. If, and I underline, if we were inclined to affirm, we don't need to reach that issue, do we? You don't need to, Your Honor. And that's why I stressed that you would be providing guidance to the district courts in this circuit, but you don't need to get to that point. Absolutely correct. If that was my question. Thank you. Thank you, Mr. Aronson. Rebuttal, Mr. Daly? Your Honor, Mr. Aronson very benignly described the press release that talks about the plane being, quote, delivered to the British. And he says, we told everybody it was going to be returned to us after testing. Well, if the court would look at supplemental excerpt of record, tab 95, page 0004, and contrast that with paragraph 62 of the complaint. In that press release, the defendants say, we've just delivered the first new Hercules to the United Kingdom, it's going to be assigned to the United Kingdom's Defense Evaluation Research Agency, and then it'll be transferred to the Royal Air Force. What we say in the complaint, what a United States Air Force colonel wrote was, it was given to the British for testing only. It will then be returned to Lockheed Martin. The first actual acceptance for the Royal Air Force is the fourth plane, which is, quote, on hold until all known deficiencies, end quote, are resolved, which would likely be in June and July of 1999. Why doesn't the automobile analogy work? Would you please repeat that analogy? Well, you buy a car and there's a recall, or you buy a car, but before you actually take it home, you ask for additional equipment to be put on it. In neither instance would anyone suggest that there hasn't been a transfer, a delivery in law to the purchaser. Well, Your Honor, there's no evidence here in the record that the delivery to the British would also involve all of the things that I believe would happen in the car analogy, which is, I've just handed my money over to Ford, I've signed the paperwork, I've given them my $20,000 for that Ford Mustang, it's still my car, but I want to leave it with them so they can put a stereo in it. This is a plane that's not even ready yet. These are planes, don't forget, that the United States Air Force is also refusing to take because they are not ready yet. The Air Force doesn't want planes that are not yet ready, and that's a quote from a general. And that actually leads into another point here on rebuttal. The Defense Council said, we had a tentative agreement in 1998 with the Air Force to take those planes. That is just simply not true. Look at paragraph 71 of the complaint. You've got the general saying this deal was turned down in 1998 because it was not in the best interest of the Air Force. We do say the Air Force agreed to the concept that it might make sense to do this sometime, but we don't say that it occurred in 1998. And that tentative agreement, that ship in place agreement, was actually not entered into until 1999. And Mr. Aronson talks about, well, so what's the big deal? So we slipped a few months. Big deal. We missed our delivery cutoff by a few months. Well, it mattered to investors because while the defendants were telling the investing world that we're going to deliver 30 of these $50 million planes, their stock went from $94 at the beginning of a four-month class period all the way up into the high, I think it might be 113. I know it went at least to 109 because that's the price at which some of the defendants sold their stock. And when the bad news came out at the end of the year that we're not making these deliveries, these deliveries that he euphemistically describes as just slipping out a few months, well, Wall Street punishes that stock with a vengeance and drops it all the way down to $82. That's why it matters whether or not you deliver a plane on time. Counsel said that we haven't shown that there were no deliveries in 1998, but we allege as a fact there were zero deliveries in 1998. We do not have to prove a negative. We don't have to show what happened to those so-called 19 planes. You know, I've got a 13-year-old... You don't have to show that as part of the positive facts that have to be, that support your allocations? What I mean to say, Judge Thompson, is I can't say to you, and the complaint does not say, plane serial number 004, the fourth plane of the 19, actually was sitting outside of Georgia or was sitting on the tarmac over in Alabama. I can't do that. What I can do is plead all the facts that this complaint, which is chock full of facts, does. And that is, it shows that any planes that had a possibility of being delivered in 1998 were actually the ones that had already been pushed out to December 1998. And we know for a fact that those were not delivered in 1998, because the Air Force tells us so. They were not delivered. They would not agree to be shipped in place, not even until 1999. Anyways, as I was saying, well, I've got seven seconds left, so I'm not going to try to say anything profound. Thank you, Your Honors. Thank you for your argument. Thank both counsel for their arguments. Really a well-argued case. Interesting case. We'll now take it under submission for decision. Thanks again. And we'll now proceed to the next case on the calendar, Lakeside Excursions versus Robinson Helicopter. Counselor, President, if they'll come forward. We'll move from military aircraft and fighters to civilian.
judges: Hug, Thompson, Hawkins